Good morning, Your Honors. May it please the Court, I'm Anne Voll representing Joe Young. There are five key points that I'd like to address this morning, the first having to do with the Americans with Disabilities Act. The next two are ADEA points, and then I would like to address points having to do with pretext. There's something I want to clarify regarding our ADEA argument. That is, I'd like to emphasize the fact that General Motors changed its stance regarding Joe Young when it learned in September of 2002 of the terminal illness of his wife. Prior to that, the record shows that at all times, at least so far as Joe Young knew, he was in the pipeline on the list at General Motors in Michigan, although perhaps he was not. But from what he knew, he was in the pipeline, and he was waiting and waiting to have a chance to go to Michigan and to be tested and interviewed for the job that he sought. Once he had informed the company of his wife's illness, which he had to do immediately for a variety of reasons, once he informed Human Resources of his wife's illness, he was in a different status with regard to General Motors. As of that point, General Motors took the position that if he wanted a job, he could go on the Internet and cast his application in with an additional, shall we say, 360,000 per year or 400,000 per year applications on the Internet and attempt to get his job in that manner as a person would do who, in the parlance of General Motors, was applying from the street. Is there any, other than the question of timing, is there anything else in the record that would suggest a connection, a nexus between his illness and his wife's illness and his not getting the position that he was seeking? Your Honor, I see the two points as being the timing and the change in stance whereby he was for the first time informed, if you want a job, get a job by applying on the Internet. But there are no statements by anybody that suggested that they were, that this was a reason for anything like that? There were no statements whatsoever, Your Honor, and bearing in mind that in the position that Young had with General Motors, he was receiving no medical benefits, no benefits of any kind. Therefore, it was a ---- Well, then why would the company care? If they're not paying benefits anyway, why would that matter? They would care, Your Honor, inasmuch as he was seeking a job, and as soon as he, as soon as he would be hired, he would have full benefits, which is that mighty General Motors benefit package. And now, not only would he receive the benefits, but they would be obviously called into use immediately for a very costly case, which indeed, although she had been expected to live for six months, indeed, she did live somewhat longer than that, and the medical bills, of course, were great. Regarding the age discrimination issue, General Motors attacks Mr. Young's qualification for his job. In a situation like this, where Young held two jobs, sometimes simultaneously, level six supervisor of maintenance and level six supervisor of operations, and unquestionably performed both jobs in an outstanding fashion, even when he was doing them simultaneously, Young's qualification should not be called into question. But more importantly, in a permitempt situation such as this, where the person in question is actually performing the job in question here over a six-year period, but for any substantial period of time, and this person has been selected by the employer to perform that job because General Motors had its pool of 360,000 persons. Obviously, General Motors would not have had Mr. Young performing these important jobs if these jobs were not deemed by General Motors to be appropriately performed by Mr. Young. So in this permitempt situation, I would argue that there should be a presumption that the job is being performed by somebody with qualifications, or else why would the employer have the person performing the job, given the choice of so many others? Regarding the ADEA, I would also like to address the question of 300 days. During those 300 days, prior to the filing of this lawsuit, which was filed on July 19, 2002, General Motors did have jobs open and did hire people at Level 6. Excerpts at 203 and 204 show six people hired within that 300-day period. And the record also shows that Mr. Young was seeking a Level 6 job anywhere in the country. And it could be a maintenance job. It could be an operations job. He was happy with either kind of job. And he was not limited in any way to Reno, Nevada. There was a policy of General Motors stated by Mr. Tibieres in the excerpts at page 74, 75. There was a first-off --"a first-on policy of General Motors," stated by Mr. Tibieres. First hired policy of General Motors regarding people that were on the list, the list being 250 people who were qualified for the job and waiting. And General Motors had an explanation for its policy. It did not want to keep people on this list waiting around month after month after month. Well, of course, we could see in Joe Young's case that is exactly what happened He was placed on the list according to the information given him late in 2000 or early in 2001. So during all of these 300 days, not only was General Motors hiring other people, but it was also violating its own policy by keeping Young, if indeed he had ever been placed on the list, which is not clear. But according to its representations, he had been placed on the list. Now we find him still on the list for what reason but age discrimination. The fact that a temporary employee at the plant where Mr. Young worked, who was in her 20s, was moved in September of 2003 from her temporary job to the plant where Mr. Young worked into a permanent job, explained in the excerpts at 229 and 231, reinforces the fact that hiring was going on, the jobs were open at the plant. And I'll move on, if I may, to the area of pretext. In this instance, pretext centers, of course, on the question of requirements or no requirements having to do with college degrees. The people that they hired, if I understand it, the people that they hired, almost all of them during this period had college degrees. Is that right? Certainly the great majority had college degrees. And we are not questioning that there may have been an institutional preference for a college degree. But, for example, Mr. Tivierge, who was in charge of the hiring center called TAC in that if a person were holding a temporary job successfully and wished to move into permanency, and if that person was well-recommended by the persons in charge of that plant, which was the case here, that he would assess that person. He would assess that person. He did not say he would hire that person, but that he would assess that person for the actual job and that that was his practice. Again, the practice in this case was deviated from. Furthermore, there are conflicts, great conflicts, within General Motors' own materials regarding what its practice or policy was at any given time. Unquestionably, in 2000, whatever practice there was, which was considered to have been temporary, whatever practice there was, was lifted or changed in 2000 to some degree. And the record shows the non-college hires after that point. Unquestionably, there was, in 1993, and there's a memo on the record to this effect, there was a situation where college was emphasized, and there is a Human Resources statement to the effect that none of the requisitions should say college or equivalent. They should say college preferred. Yeah. He was not hired on a permanent basis. Never. He did apply. He was actually put in a position where he never had to apply because he was recruited in his own plant, and he was launched on his pathway. Well, that's what I'm asking. He was placed on the list. He never did. What is the action that was then what is the action that was a denial of employment? He was denied employment, and he was denied the opportunity to assess for employment. There was reason to believe that if he had assessed. Well, did the employer have information before it, did General Motors have information before it that he wished to have a permanent job and that he did not have a college degree? Yes. It had that information certainly as of 2001, and the memoranda now bearing in mind the odd circumstance that in all of General Motors' records, there exists almost no trace that Mr. Young ever worked for General Motors at all. But there are several emails, and those are on the record. The emails show that the resume of Mr. Young was in Michigan, and human resources person Mr. Herman at the local plant is saying in his email to Michigan, he is saying, you have the resume of Mr. Young because he was scheduled to have been assessed last year, I think the word is. So it was not a question of filing an application and having the application rejected. No, there was never a question. It was a question of having this information and not assessing it. Is that correct? That is correct. And sometime in the middle of 2002, during the summer of 2002, Mr. Young came to realize that he was kidding himself and that his application, if we want to call it that, or his search for employment within GM was stymied. Well, at any time did GM ever give him a statement as to why it was not assessing him, or did he ever ask for one? He was always given so much encouragement that he was always led to believe that assessment was right around the corner. And so he respectfully was awaiting to hear from Human Resources when he was to go to Michigan. And that brings me to the final point that I wanted to make, and that is college, the need for college as pretext, quite aside from the fact that GM's own records show requisitions during the relevant timeframe that call for associate's degree or equivalent, quite aside from the fact that their master book of requirements called the Red Book indicates that for this position and the position above it, what is required is high school diploma or equivalent, quite aside from that, this is different from the ordinary pretext. I'm calling this super pretext for the following reason. This isn't just a situation where after a discrimination charge was filed, the employer gave an explanation that may not have been strictly factual. This is more than that, because this raising college as this or that kind of an absolute requirement, and making those statements to Joe Young over a long period of years is quite different than raising the college issue merely as a defense after the fact once the cat is out of the bag and the discrimination charge has been filed. Here, the college issue was raised from 1996 onward. It was first raised by Mr. Markham in 1996, who was in a very high position, and indicated to Mr. Young that this was a requirement that would soon be lifted, that was somehow temporary, and when this breaks, et cetera, et cetera, et cetera. This was a representation that was made, and it was often made incorrectly. It was made by many people. It was made by people in high positions, and it was not made by Michigan. It was made by regional directors and the plant managers under them and people in human resources and a regional human resources manager. But looking at the cat. Sotomayor, I'm sorry. Is your argument that a college degree requirement is inherently discriminatory or simply that it was not really in place and it was just an excuse in this individual case? Your Honor, I'm arguing that it was just an excuse in this individual case and that it was not really in place, and that the inconsistency shows that. But on the other hand, I think a college requirement for a job that does not connect to college or does not have where the college degree could be most anything and has no nexus to the job itself is inherently suspect. Well, inherently suspect with respect to age? I mean, classically that came up where people would say, you know, you don't need a college degree to sweep floors, and this is a way to keep in, you know, 30 years ago, racial minorities. Yes. But is there any suggestion that people over a certain age don't go to college or haven't been to college? I mean, that's a point. I'm not arguing that point, although that point may be true. But that's not a point that I have argued here. Okay. Once again, what was it that GMC did that was on the basis of age and not because he had or didn't have a college degree? Not to assess him. Not to assess him. Not to assess him. Even after it had, according to the testimony of Mr. Robertson, it had eased or changed that requirement. According to GM's own witness, Ms. Reisman, that requirement was changed in 2001. But when did this happen? I just am still not understanding. When did this happen that he was not assessed? He was not assessed over a period of six years. He always thought he would be assessed. He watched, first of all, during his early years at the plant, Your Honor. So when did his claim accrue? His claim accrued when he first realized that he was not going to be assessed. When he first realized in the middle of 2002 that GM was, in fact, hiring people who did not have a college degree. And the college degree, and he learned that from somebody named Stewart, whose deposition is on the record, who explains the very great flexibility of this requirement. In other words, the requirement is the wrong word. He learned from he had no direct access to this knowledge because he did not see a person at his plant where he was working receive that job without a college degree. He had to learn. But you're not claiming a breach of contract. No. We're not claiming a breach of contract. There was no contract, Your Honor. So where do we get an inference that this was because of age and not because of something else, negligence or something else? Well, I think, Your Honor, that it couldn't have been negligence, and it couldn't have been a breach of contract because the only contract, if any, that Mr. Young might have had, this was not a contract. I mean, I think when you're hired by Kelly, that is not a contract. You seem to be claiming he's relying on representations that he would be assessed. He never put in an application. He never asked them, I want this job. He just was kind of there as a temporary worker, being told, well, you know, maybe we'll do something. Because, Your Honor, if there ever was an application blank, he did not know of it. The process by which people applied on the Internet did not evolve until 2001. Mr. Tvierge indicates that that was gradually brought into place and that it was up and running sometime in 2001. He straddled a period when there were many changes that were not explained to him. His position at the plant was such that he was so important to the running of the plant and so positive from everything that was said to him that they wanted him to be there as a permanent employee, it was never suggested to him in any ways whatsoever that there was any procedure for him to follow, and therefore, he did not. Thank you. It's your way over time. Thank you very much. May it please the Court. Good morning. My name is David Vogel, and our office represents General Motors Corporation in this matter. This matter, quite obviously, is before the Court on an order granting summary judgment out of the District of Nevada. And so looking at it from the summary judgment perspective, we need to focus, I would respectfully suggest, on what the district court's analysis was with regard to the undisputed facts that were before the Court. And there's one key undisputed fact, which is General Motors prefers that its That's mentioned on page 13 of the district court's order, and I don't think there's any debate about that. It's in the appellant's brief. Mr. Young said it in his deposition. Counsel repeated it again as oral argument. Well, just help me. Sure. What is it that your client allegedly did that was for the reasons of the fact that he didn't have a college degree rather than the fact that he was old? It's my understanding, Your Honor, that the whole allegation the entire time was that he was not hired from his contract supervisor position into a regular salaried employment position, and that the reason we gave was that we preferred people to have college degrees. And when did you give that reason? Well, that's a good question. I believe, if you look, Your Honor, in the record that cites, and I have not parsed through it to specifically tab the portion of the record, but in page 2 of the judge order, which discusses in 1996 time frame when Mr. Young first became a contract supervisor at this facility and started talking to his supervisors about the possibility of obtaining regular employment, he was told repeatedly, you know, you really don't meet our hiring criteria because we look for people with college degrees, but we'll talk to people. We'll see what we can do. So we would say from the outset that at the very least, most if not all the folks they hired had college degrees. And we would submit that this case really centers around, is that stated college degree preference a sham or a pretext for unlawful age discrimination? And if you look at the numbers, that just can't be correct. If the charge was filed, the lawsuit was filed on July 19, 2002. The charge was filed on July 12, 2002. If you reach back 300 days from that, which we would argue is the proper limitations period, it takes you to September 16, 2001. In that 300-day period, there were actually 11 full-time supervisors hired into entry-level positions, which counsel referred to them as level 6. That's generally where they come in. They also come in at level 5. Of those 11 supervisors, 10 of them had degrees. There was one exception. The individual who the exception was made for was actively enrolled in college and was pursuing, and I'm not sure if it was a male or female because I don't think we identified the folks, so pursuing his or her degree. Which, if you note in the record, there was a 2001 memorandum that GM put out and said while we generally require college degrees, we will evaluate people on a case-by-case basis who are actively enrolled and pursuing their degrees. This individual is important to point out, and I'll go ahead and call it an exception. Who this exception was made for was 48 years old at the time they were hired. So that would directly belie any suggestion that this college degree preference, which is really what it was, was used as some sort of screen to eliminate folks in the protected age group. In fact, the one exception arguably made in the limitations period. What were the ages of the other 10? They were under 40. You know what? I beg your pardon, Your Honor. Four of the 11 were 40 or older. One was 42 or 40. I'm sorry. One was 43. Two were 43. Two were 43. One was 46. One was 48. So out of 11, and keep in mind, respectfully, Your Honor, these are entry-level positions. So this is where sort of people get into the management structure of GM. So we'd submit it's not surprising that many of those folks would not be older. Well, he was working there all this time? That's correct. In what capacity? It was a contract role. He was actually, I believe, an employee of Kelly Services, which is how GM frequently fills certain positions in its organization. It's filled with people. I don't quite understand how we get to the point of trying to figure out what the basis was for a decision, because I'm not quite understanding what decision was made by General Motors. Do you agree with the plaintiff that there were encouragements made to him to that he would be or representations made to him that he would be considered for permanent employment? I'm not sure if the record reflects that he would absolutely be considered. I think the record reflects that people said we like you, we think you're doing a good job, even though you don't meet the standard criteria, we'll see what we can do. And, in fact, they did that. I think folks at Reno at the local facility contacted corporate in Michigan and said, can we get this guy through the process? And the response was generally, well, there were two responses, frankly. One is there wasn't a lot of hiring at Reno going on during this time period. The last hiring at Reno prior to the September 2003 hiring, which I do want to touch on for a moment, was in 1999. So from 1999 to 2003, there was no hiring at all in the Reno division. But the second response was, and I will acknowledge it's unclear whether the folks at Reno directly conveyed this back to Mr. Young, but that the folks in Michigan said, you know, except in extremely rare cases, we're going to look at college degrees. And we pointed out during the or people who are actively enrolled in college and getting their degrees. And as we noted, in the limitations period, they followed that policy or practice, whatever we want to call it, 100 percent of the time. We'd argue you really can't challenge the decisions made outside of the 300-day limitations period. In that regard, we'd also note. But that evidence could be pertinent to the issue of motivation. Absolutely, Your Honor. With respect to decisions that are made within the limitations period. Absolutely, Judge. And if you look then, so then let's look at those numbers. If we reach back to 1996, when Mr. Young first began working as a contract supervisor at the plant, through the end of 2002, when he left that job, there were 192 people hired within the SBO division nationwide, which is a series of, I think it's half a dozen warehouses in different locations. That's what these are. They're parts warehouses, just for the Court's knowledge. 192 people were hired. Out of those 192, 184 had their degrees. Two were actively enrolled in college and in the process of seeking their degrees. So we would submit 186 out of 192 people fit the college degree preferred. There were six exceptions, none of which are in the limitations period. Of those six exceptions, two were in the protected age class. One was older than Mr. Young at the time he was hired. So we would submit that, one, when you follow a policy or practice 97 percent of the time, the fact that you made diversions of that in a sample size of 190 plus people six times is not sufficient evidence of pretext. Second, it's very clear based on the ages of the people actually hired, and I don't want to be overly clever with statistics, but when you have a pool of six and two out of six are in the protected class, which is almost half, I mean it's a third and almost half, where's the suggestion that that college degree preference, which everyone agrees is a true preference, is being used or exceptions are being made to screen out older people? And by the way, no exceptions were ever made or have ever been made to our knowledge at the Reno facility, which is where the plan for it. And what Mr. Tibierge actually said in his deposition was, we would consider a contract supervisor who might not have a degree at the facility where he is a contract supervisor. That same consideration would not carry out nationwide. So we would submit in response to Your Honor's question, Judge Graber, that even if you do look at it historically, yes, there are exceptions, which is generally where we establish pretexts. Are you making exceptions to the rules? But the exceptions were so rare and almost equally benefited people in the age-protected class as they did younger people that how can we say it's a pretext for age discrimination? That simply doesn't go with the stats. In fact, if you look at the total six years and the 192 people hired, Judge, you asked me how many people in the limitations period were 40 or over, and it was four out of 11, which I'd submit is a pretty decent percentage for an entry-level position. If you look at the whole seven-year period, 1996 to 2002, there were 31 people who were 40 or older out of that 192. Now, that might not sound like very many, but again, it's 15%, which when we're talking about an entry-level job, we would submit. And I don't have any sort of occupational studies showing that, but if it's fair to enact that. Do you have any comparison to the age breakdown of the applicant pool? Well, Your Honor, I think because of some other laws, we don't have an age breakdown of the applicant pool, because General Motors doesn't, one, doesn't request information regarding age in any of its applicant processes. And also, the screening process, and I'm sorry, I don't have the record site for this, but the screening process, when GM takes in all of these resumes, they pump them into a computer, and the resume, the computer search from my understanding is it's age blind. So, no, General Motors does not keep records regarding the age of people who apply. We don't have any way to know if the 15% represents, you know, oversubscribed or undersubscribed based on who actually tried to get in the door. We don't know one way or the other. And I'd submit that, again, as an entry-level job, if it's a fair analogy, a law firm, which I realize is different, but certainly at my law firm, and I think at most all around the country, entry-level attorneys, I think if you did a study, most of them are in their 20s or 30s, because that's how the entry-level folks come in, and that's how we see that happening. In fact, and I think this is important, again, I'm not trying to be cute with these statistics, but six of the 192 people hired were in their 50s. So when the appellant states in their brief, in their reply brief, in fact, on page 19, where they say, well, GM has a policy if they just don't hire people in their 50s. Well, if the attack is, well, you made exceptions to this college degree preference policy, we did that six times over seven years. You don't hire people in their 50s, we did that six times over seven years. So for every time we make an exception to the policy, there's also an example of an incident where we hired someone in their 50s. We hired a lot more people than that in their 40s in terms of these things. I want to touch on, because I do think it jumps out in the briefs somewhat, about this contract supervisor who was hired in September 2003. I don't know if the Court's familiar with it. I'll mention it quickly. I'll mention her by name, because her name does jump up several times. A woman named Holly Hardison, who, yes, was in her 20s, was hired at the Reno warehouse. She was a Kelley contract supervisor. She was hired in September of 2003. A couple of points about that that are brought up, and I think they're very well addressed in the district court's order, because this came up after the close of discovery, after an order had been issued on summary judgment. The plaintiff raised this as sort of a motion for reconsideration under Rule 60. First and foremost, this individual had a bachelor's degree. And although the record does reflect the beginning in 2003, some folks at SPO did say, quit knocking people off the list for consideration if their contract supervisor don't have a degree. The preference was still for people with degrees. And she did, in fact, have that degree. Well, you know, I understand, and maybe I hear what you're saying. It's a little troubling to me that this guy is working in Reno, and did he want a job someplace else, or did he want this job, and he wanted to stay where he was and everybody there liked him. He was doing a good job. And now you say, well, the decision was made on high by General Motors that we want people who have college degrees, even though this guy has been working here, he's very well liked, he's been encouraged, gets recommendations from all of the folks. And it happens that somebody else is hired there who's 20 years younger in the position that he wants. Can I address that in two ways, Your Honor, please? One, with regard to the hiring decision specifically that's there, I want to hit that real quickly procedurally and substantively. One, that information was in the plaintiff's hands no later than January of 2004. They didn't raise it for more than two months thereafter. Okay. The other point being this. The plaintiff, and I think this is important, and I was jumped on a little bit on this when the plaintiff filed a reply brief on the Rule 60 issue. But in the course of this case, and it's mentioned in the record excerpt 98, it's also attached as exhibits in the record to our opposition to the Rule 60 motion before the district court. The plaintiff's counsel had sent a letter to GM's counsel in the summer of 2003 that said unequivocally, please inform your client, General Motors, that Joe Young no longer seeks a job at GM as part of his damages. And that point. Now, the shot fired at me was that was in the context of settlement discussions. And I quote Rule of Evidence 608 that says that's not fair. It's not fair to say, tell your client he's not interested, and then say, you know what, he should have been hired for this job filled in September 2003. We're not trying to do what's fair between the parties here. I'm sorry, Your Honor. We're not really trying how the case was handled between the attorneys. We're really trying to do what's fair and according to law for the parties. Well, let me address your Honor. There's another point to be made, too, or a question that I have. The fact that maybe he had taken himself out of the running doesn't necessarily imply that everyone in the running was under 40, so there was no more opportunity to be discriminatory. In other words, he may have been out of the running, but for all we know there were five people seeking it, all of whom were older than the person who was hired. So I'm not sure that that, you know, statement, well, we couldn't give it to him, really gets you totally off the hook about motivation. It may get you off the hook as to that being the triggering moment or the event when he should have been hired on. I'm not making myself very clear. I'm not sure. With absolute respect, I'm not sure if I understand the question. Are you saying that since even if this particular, is it sort of like reaching back beyond the statute of limitations? No. It's saying that we don't know, at least I don't sitting here, whether there were other individuals who also sought that position that the younger woman obtained and that they likewise were older workers. And honest to goodness, Judge, I just don't think that's in the record. So I'm not sure if we can. So we don't know. If we can even speculate on that because we don't exactly know how that was filled. But with regard to the question about the issue of, gosh, it doesn't look like he was a good supervisor and he was a good person and they liked him at the Reno facility. First, I'd submit, and I really think it passes the smell test, there's not evidence that the folks up in Michigan who shot down from on high the message, we're really looking at people with college degrees, knew how old he was. His resume is not in the record. I haven't seen it in the record. He suggests that the year of his high school graduation was on there. I don't think there's any evidence anybody ever saw that. But I think more important is there's the Barnes case in the Sixth Circuit, the Rhea case in the Tenth Circuit cited in our brief, and even the Cotton case, 812 F. Second, 1245 in the Ninth Circuit, cited in our brief, which Cotton does not deal specifically with the issue of college degrees. But those cases are really the business judgment rule. Do we know on what basis they did make the decision then, what information they had in Michigan? They didn't have a degree. I mean, that's really what they had. Pardon me? What did they have, his name, his Social Security number? They had his name and phone calls from people at the SPO saying, we've got a contract guy who we like a lot. Could he be considered for a regular position? Age, or the fact that he didn't have a college degree? They told them that. That was very clear that the folks at the Reno facility were saying, we've got this guy. He doesn't have a degree. And the resume screening process did look for degree. That was the key thing. It didn't look for years. It didn't look for how old somebody was. It looked for degrees, and it looked for experience. And that's what they had. And I'd say, Judge, on the degree issue, there are those cases cited in our brief in which they explicitly state, you know, it's not an argument to say a college degree really wasn't required for this job. The point is, if the company truly prefers people with college degrees, they follow that policy in most situations. It doesn't seem to be a pretext for knocking out people of a particular class. And I think that's a very good point. There's no record or evidence, despite a statement in the brief, well, older people are less likely to have college degrees, which is in Appellant's brief. There's no statement to that effect. Ironically, the Stein case, which is a Sixth Circuit case cited in the briefing, which is one of the only cases we could find, honestly, that deal with this college degree issue, it was the opposite. A gentleman wasn't being hired because the company said, we don't hire people with college degrees because they think they're overqualified. And he said, that screens out older people. So I don't think there's any empirical evidence or anything with regard to that. I just want to use my last minute, if I can, to touch on the ADA claim, because I haven't. I think we argue about the fact that was there a knowledge issue. I'll admit nothing changed after that. They didn't hire Mr. Young before the tragic news about his wife's illness. They didn't hire him afterwards. It was the same reason. The one individual hired in the SBO division between September 2002, when he learned of his wife's diagnosis, and May of 2003, when sadly she died. It was one person. It wasn't in Reno. That person had a college degree. And in fact, the evidence in the record is the company called Mr. Young and said, hey, we might be doing some more hiring. Could you please submit a resume? And he didn't do it. There's some issue as to whether he was confused on how to do it, but he didn't do it. Okay. Thank you. Thank you very much. You have used all your time. Do you want to say something very briefly? I thought I might if I may. Very briefly. The only phone conversation that's on the record between the plant and General Motors in Michigan is the one which the record shows that Mr. Young was privy to. It was the phone call that was a statement from Michigan to human resources at the plant saying to the plant, Mr. Young is now on the list, which he was allowed actually to listen to because it was a voicemail. And the record shows any little chit-chat about who had a college degree or who didn't that was carried on over the phone. None of that is on the record. There is no such thing. For purposes of this case, no such phone conversation even exists. Thank you. Okay. The matter just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Graber, Duffy